**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

VICTOR CHEONG,

    Plaintiff,

v.

THE BANK OF EAST ASIA, LTD., THE
BANK OF EAST ASIA, LTD., NEW YORK
BRANCH,

    Defendants.

---

Civil Action No.: _____--_____


**COMPLAINT**

The  Plaintiff Victor Cheong ("Plaintiff"), by his attorneys Law Office of Andrea

Paparella, PLLC and Litt Law, LLC, alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      The Plaintiff brings this action under the: a) Age Discrimination in Employment Act of

1967, 29 U.S.C. §§ 621-34 ("ADEA"), b) Title VII of the Civil Rights Act of 1964, as amended

("Title VII"), c) the New York State Executive Law § 296, *et seq.* ("New York State Human Rights

Law"), and d) the Administrative Code of the City of New York § 8-101, *et seq.* ("New York City

Human Rights Law").

2.      The Plaintiff brings this action against the Defendants The Bank of East Asia, Limited,

New York Branch ("New York Branch") and The Bank of East Asia, Limited (collectively

"Defendants") alleging systemic discrimination based upon his national origin, age, and sexual

orientation, and retaliation against him for complaining about such discrimination.

1

## JURISDICTION AND VENUE

3.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

4.       The Plaintiff timely filed a Charge of Discrimination against the Defendants with the United States Equal Employment Opportunity Commission ("EEOC") on September 2, 2021. A true and accurate copy of the Charge is annexed hereto as Exhibit "A."

5.       The EEOC issued a Right to Sue Letter dated July 29, 2022. A true and accurate copy of the Right to Sue Letter is annexed hereto as Exhibit "B."

6.       Venue is proper under 28 U.S.C. § 1391 (b)(2) because a substantial part of the events giving rise to the Plaintiff's claims occurred within the Southern District of New York.

## THE PARTIES

7.       The Plaintiff is a 62-year-old American Citizen, born in the Philippines, and an unmarried gay male.

8.       The Plaintiff has a Master of Business Administration degree from Harvard Business School, and decades of successful experience in commercial banking in the United States.

9.       The Plaintiff is fluent in Cantonese, Mandarin, and English.

10.      The Defendant The Bank of East Asia, Limited is a Hong Kong banking and financial services company with over 9,000 employees, headquartered in Central Hong Kong.

11.      The Defendant New York Branch is a branch of The Defendant The Bank of East Asia, Limited presently with approximately 50 employees, and located at 540 Madison Avenue, 10th Floor, New York, New York.

12.     The Defendants systemically discriminate against individuals from countries or regions considered less prestigious than Hong Kong.

13.     The Defendants only allow top ranking positions to be filled by individuals from Hong Kong, or from individuals from Asian countries they deem comparable in status to Hong Kong.

14.     Despite decades of experience in commercial banking in the United States, a Master of Business Administration (MBA) degree from Harvard Business School, and his dedication to the Defendants, Defendants have repeatedly humiliated the Plaintiff by not merely not promoting him, but by demoting him.

## **FACTS**

15.     On May 23, 2019, Defendants announced that Dr. David K.P. Li, approximately 79 years old at the time, was retiring as Chief Executive, and being re-designated as Executive Chairman effective July 1, 2019.

16.     The Defendants' Board of Directors approved the sons of Dr. David K.P. Li, Adrian David Li Man-kiu and Brian David Li Man-bun to be Co-Chief Executives.

17.     Adrian David Li Man-kiu was approximately 44 years old at the time of the approval.

18.     Brian David Li Man-bun was approximately 43 years old at the time of the approval.

19.     Shortly after the appointments of Adrian David Li Man-kiu and Brian David Li Man-bun as Co-Chief Executives, the Defendants began a campaign to alter their demographics so that management would skew dramatically younger.

20.     In the year 2020 and into early 2021, the Defendants replaced at least three individuals, all aged approximately 60 years, who held senior divisional head positions in the Hong Kong Head Office with individuals who are significantly younger.

21.     The three senior positions referenced in the immediately preceding paragraph are Head of the Human Resources & Corporate Communications Division, Head of the Risk Management Division, and Head of the Finance Division.

22.     Adrian David Li Man-kiu and Brian David Li Man-bun both work from Defendant's Hong Kong Head Office.

23.     Adrian David Li Man-kiu and Brian David Li Man-bun both are married to women and hold themselves out as heterosexual.

24.     Being gay is highly taboo in Hong Kong.

25.     The Defendants have paid and continue to pay the Plaintiff substantially less than they have paid his less qualified peers.

26.     The Defendants have unfairly attacked the Plaintiff's performance in a pretextual attempt to terminate his employment for false cause.

27.     Upon information and belief, the Plaintiff's former boss and General Manager of The Bank of East Asia, Limited, New York Branch and Regional Chief Executive Victor Li ("Li") was born in Hong Kong.

28.     Li is married with a child, and holds himself out to be heterosexual.

29.     Prior to Li, the General Manager of the New York Branch was Peng Hwa Tang.

30.     Tang is from Singapore.

31.     Individuals from Singapore are considered by the Defendants to be comparable in prestige to individuals from Hong Kong.

32.     There is a wide-spread notion in Hong Kong that people from certain Asian countries are inferior to individuals from Hong Kong.

33.     Individuals from the Philippines are widely considered to be inferior to individuals from Hong Kong by people in Hong Kong, including the Defendants.

34.     This perception is traced back to the many Filipinos who serve as housekeepers in Hong Kong. The South China Morning Post, a well-regarded English media out of Hong Kong, has chronicled accounts of mistreatment of Filipino domestic helpers by their Hong Kong employers and the racist treatment of the Hong Kong authorities towards them.

35.     The Defendants have demonstrated and participated in favoritism towards individuals from Hong Kong and people from countries they consider superior, and discrimination against individuals from countries they consider to be inferior such as the Philippines.

36.     Such favoritism and discrimination can be seen from the personnel who hold senior positions.

37.     Such favoritism and discrimination can also be seen in the Defendants' office dynamics, as only certain individuals are deemed socially acceptable for office interaction.

38.     The Defendants have only ever filled the General Manager position of its New York and other branches with individuals from Hong Kong or countries viewed as comparably superior, such as Singapore.

39.     In March 2016, Li, the then General Manager of the New York Branch and Regional Chief Executive, hired the Plaintiff to be Head of the Business Development Department.

40.     The Plaintiff's primary role was to originate commercial real estate loans with the Business Managers and Business Officer reporting to him.

41.     When Li hired the Plaintiff, he acknowledged the Plaintiff's potential to assume higher positions and greater responsibilities with the Defendants.

42.     The Defendants hired the Plaintiff with a starting annual salary of $150,000.00.

5

43.     During his interview with the Defendants, Li indicated to the Plaintiff that he could expect to replicate what the Plaintiff was making during his last two years at Mizuho, which was about $400,000 annually, in the near future, and even possibly succeed him as the General Manager.

44.     Before the Plaintiff joined the Defendants, he had an exemplary 25-year career in commercial banking in the United States.

45.     The Plaintiff worked at the New York branch of Mizuho Bank, Ltd. ("Mizuho") for twenty years. Mizuho is a large Japanese bank, substantially larger and with a more extensive business presence in the United States than Defendants. The Plaintiff's last position at Mizuho was Deputy General Manager and Head of the Loan Syndications Department.

46.     After leaving Mizuho, the Plaintiff worked at China CITIC Bank International, Limited ("CITIC") in New York City, as Chief Lending Officer for five years. CITIC is a comparable bank to the Defendants.

47.     In a bank-wide circular dated January 25, 2017, Chairman and Chief Executive David K.P. Li announced the restructuring of the Defendants' China Division and International Division. The restructuring was the result of substantial losses suffered by the Defendants in China. Per the announcement, the China Division will continue to be supported by China Business Department headed by Maggie Kar-Lai Wong ("Wong"), a native of Hong Kong.

48.     In another circular dated June 30, 2017, David K.P. Li announced that Wong would be transferred to the Overseas Branch Operations & Development Department effective July 1, 2017, and then to the New York Branch effective August 10, 2017.

49.     In approximately August 2017, the Defendants hired Wong with a newly created title and position of Senior Vice President of China Business.

50.     The Defendants posted this position neither internally nor externally, thereby depriving the Plaintiff the ability to apply.

51.     The Plaintiff was deprived of an opportunity to apply despite the fact he was performing the responsibilities of the Senior Vice President, China Business for the New York Branch before Wong was transferred.

52.     The Defendants paid Wong a compensation package worth between $240,000.00 to $340,000.00 more than the Plaintiff's compensation package, exclusive of annual bonuses, fringe benefits such as rentals for her luxury apartment, car allowance, and payment of family member's tuition and annual trips.

53.     According to Defendants, Wong was transferred to support the further development of business opportunities with borrowers from the People's Republic of China doing business in America.

54.     The Plaintiff was significantly more qualified than Wong to perform this role.

55.     In fact, one reason Li told the Plaintiff he was hiring him was the Plaintiff's experience with customers from China at CITIC, and because he speaks Mandarin.

56.     Li refused to permit the Plaintiff to pursue more China business because of the deteriorating financial conditions of China-based companies and real estate developers.

57.     The Plaintiff presented Li with a number of loan opportunities involving China-based companies and real estate developers, but Li showed no interest in pursuing them.

58.     The Defendants' practice had therefore been inconsistent with its stated reason for hiring Wong to pursue further business with China-based companies and real estate developers.

59.     Wong came from the China Division in the Defendant's Head Office that oversaw the business of Defendants in China.

60.     Prior to Wong's transfer, the Defendants suffered significant losses and scaled back its business in China.

61.     When the Defendants hired Wong for the Senior Vice President of China Business position, she had no experience in banking in the United States.

62.     Upon information and belief, Wong does not have a graduate degree comparable to the Plaintiff's MBA from Harvard University.

63.     In the first quarter of 2017, preceding Wong being hired as Senior Vice President of China Business, Cheong received a 2016 performance rating of 4 out of 5.

64.     A performance rating of 4 out of 5 is a very strong rating.

65.     The Plaintiff is unaware of anyone at the New York Branch who has received a rating of 5 out of 5.

66.     As a result of his 2016 performance assessment, the Plaintiff received a bonus and salary increase.

67.     Wong was approximately 50 years old when the Defendants hired her for the new position at the New York Branch, approximately seven years younger than the Plaintiff.

68.     Wong was married with a family, and holds herself out to be heterosexual.

69.     Upon arrival in the New York branch in August 2017, Wong lost no time in telling the Plaintiff that she is well connected to Brian David Li Man-bun of the ruling Li family, who was by then already overseeing the Defendants' China Division and International Division to which the New York Branch reports. When asked about her achievements while at the China Division in the Head Office, Wong cited that she set up the Wuhan representative office of the Defendants in China, one of many branches in China believed to have led to its substantial losses.

70.     The Defendant's promotion of Wong to a position the Plaintiff was more qualified to fill, including duties he was already performing, and paying her hundreds of thousands of dollars more is an example of the Defendant's favoritism toward individuals who hold themselves out to be heterosexual, are from Hong Kong or countries considered to be of similar prestige, and are younger.

71.     On April 19, 2018, Li circulated a revised organizational chart and updated Job Descriptions for both the Plaintiff and Wong.

72.     The organizational chart showed that all of the Plaintiff's previous direct reports now reported directly to Wong, instead of to the Plaintiff.

73.     The Defendants had given the Plaintiff's position to Wong, albeit with a different title.

74.     Wong's new job Summary stated her duties to be: a) to assist the Branch to achieve its KPIs and budget, b) cultivate new business and new customers with China / Hong Kong background for the Branch, c) maintain cordial relationships with existing customers, d) review new credit proposals, credit review, status reports, and other reports of the Department, e) supervise and train team members, and f) be responsible for the human resources and administrative issues of the Department.

75.     The Plaintiff had previously performed all duties set forth in the immediately preceding paragraph.

76.     Before the change removing the Plaintiff's direct reports, Li performed the Plaintiff's 2017 performance evaluation, and again rated him strongly with a 4 out of 5 in early 2018.

77.     After the April 2018 organizational change stripping Plaintiff of managerial responsibilities, Plaintiff was given a performance threshold target of originating new loans of $319,000,000 for the year 2018.   This was almost a 300% increase from the $109,523,505

performance threshold for 2016 and more than three times increase from the $90,287,155 performance threshold for the year 2017.  Defendants issued the much higher performance target of $319,000,000 in 2018 to set the Plaintiff up for failure to meet the business development goals.

78.    When Wong was SVP & Head of China Business & Corporate Lending Department, she undermined the Plaintiff's loan originations on multiple occasions.

79.    On numerous occasions, Wong made it difficult for the Plaintiff to have a Business Manager with whom to work when the Plaintiff successfully initiated potential new deals, making it challenging for the Plaintiff to develop business.

80.    After Wong became SVP & Head of China Business & Corporate Lending Department, Defendants rated the Plaintiff a 3 out of 5 for 2018.

81.    The lower rating of 3 (compared to the 4s Plaintiff received for 2016 and 2017) was due primarily to Plaintiff's originating "only" $200,000,000 of loans against the unreasonable threshold set at $319,000,000.

82.    $200,000,000 was a significantly higher number than what the Plaintiff achieved in both 2016 ($126,894,062) and 2017 ($111,073,424) when Plaintiff received ratings of 4 out of 5.

In an attachment dated January 17, 2019 to his 2018 performance rating, Plaintiff explained about the difficulty of his job was in securing the timely availability of staff support when he had new deal prospects.  Wong who was in charge of assigning jobs to the account officers, was prioritizing her own new deals and annual reviews.  In effect, Plaintiff's new deals got secondary attention and support.

83.    During the time Wong was the SVP and Head of China Business and Corporate Lending Department in 2018 and 2019, she repeatedly and unjustifiably criticized Li in the Head Office and before the ruling Li family for his performance as General Manager of the New York Branch.

84.     Effective January 1, 2020, the Defendants replaced Li as General Manager of the New York Branch with Wong.

85.     Wong is approximately twelve years younger than Li.

86.     Li allegedly retired at the end of February 2020, and the position of Regional Chief Executive was abolished.

87.     Before his retirement was announced, Li confided to the Plaintiff that he did not want to retire so soon.

88.     The Defendants again never advertised the General Manager position given to Wong, and thus the Plaintiff was prevented from applying.

89.     The General Manager position of the New York Branch has never been held by someone who is openly gay.

90.     The General Manager position of the New York Branch has never been held by someone who is not from Hong Kong or Singapore.

91.     Neither the Defendant's Hong Kong Head Office nor any of its branches in New York, Los Angeles, London, Singapore, Taiwan or Labuan, Malaysia have ever had a General Manager who was not from either Hong Kong or Singapore, Taiwan or Malaysia, which are considered equal in status to individuals from Hong Kong.

92.     Neither the Defendant's Hong Kong Head Office nor any of its branches in New York, Los Angeles, London, Singapore, Taiwan or Labuan, Malaysia have ever had a General Manager who did not hold him or herself out as heterosexual.

93.     While Wong was SVP & Head of China Business & Corporate Lending Department from 2018 to 2019, she originated loans to about four borrowers worth approximately $334,500,000.00.

94.     In 2020, approximately $230,000,000.00 of that $334,500,000.00 was deemed by the United States to be illegal. A significant amount of these loans presently remain outstanding.

95.     During the time period that Wong was SVP & Head of China Business & Corporate Lending Department, the Plaintiff originated more than Wong -- approximately $360,000,000.00 with multiple U.S. based borrowers.

96.     None of the Plaintiff's deals were illegal, and he accomplished his origination without the direct report coverage that the Defendants took from him to give to Wong.

97.     Just after General Manager duties were transitioned to Wong in January 2020, the Defendants rated the Plaintiff a 2 out of 5 on his annual 2019 performance review.

98.     The Defendant's 2019 annual performance review of the Plaintiff was intended to serve as pretext for his termination and/or demotion.

99.     With Wong's promotion to General Manager, the Head position which the Plaintiff had held before Wong was again vacant.

100.    The Plaintiff was the most qualified person to fill the vacant Head position.

101.    In mid-January 2020, Wong initiated a meeting with the Plaintiff and informed him that she was not going to return the Head position to him.

102.    Among other things, this was an admission by Wong that the Defendants had indeed previously given her the Plaintiff's Head position.

103.    Wong told the Plaintiff during this meeting that she was going to hire a new person for the Head position, and that the Plaintiff would be reporting to that new person.

104.    During this meeting, Wong intimidated and humiliated the Plaintiff by telling him that people at the bank were talking behind his back.

105.    The Plaintiff believed that Wong was referencing his being gay.

106.   The Plaintiff was distraught.

107.   The Plaintiff believed that Wong intimidated him in this way with the intent of weaponizing his sexual orientation so that he would not question why he was not returning to the Head position.

108.   The Plaintiff's belief was formed in part because Wong has a clique of employees from Hong Kong and China who pry into the Plaintiff's personal life.

109.   Wong provides favorable treatment to this clique of employees in exchange for information about the personal life of the Plaintiff. Two of these favored employees were in the Plaintiff's department: Helen Shek from Hong Kong, and Yibo Li from China. Upon information and belief, Yibo Li was hired by the Defendants on an H-1 working visa due to his father-in-law's connections to the Defendants. Upon information and belief, the father-in-law is a Chinese Communist Party government official in the city of Shenyang in China, where Defendants have an operating branch.

110.   As one example Yibo Li displays an unusual curiosity about the Plaintiff's personal life.

111.   Yibo Li questions the Plaintiff about whom he travels with on his vacations.

112.   Yibo Li has rummaged around the Plaintiff's desk, looking at his papers and his personal iPhone.

113.   Wong's favoritism toward those with favored national origin status extends beyond the Plaintiff's department.

114.   Wong demonstrates preference for James Hua ("Hua") over the Plaintiff.

115.   For example, whereas Wong constantly exhibits hostility toward the Plaintiff, Wong strongly supports Hua's corporate deals and business dealings during weekly credit committee meetings.

116.     Wong was instrumental in getting Defendants to approve for Hua a line or basket of up to approximately $162,000,000.00 in new loans below the bank's pricing hurdles, making it easier for Hua to originate more loans. Wong initiated this line for Hua as early as 2018, and renewed it every year thereafter demonstrating Wong's influence and hold on the New York Branch even while Li was the General Manager.

117.     Wong and the Defendants give the Plaintiff inferior treatment on the commercial real estate loans he initiates.

118.     Wong also demonstrated a preference for Hua while in her Head role, before becoming General Manager.

119.     Hua is significantly less experienced than Cheong.

120.     Despite being less experienced and less qualified than the Plaintiff, the Defendants promoted Hua to the highest Senior Vice President level while holding the Plaintiff at the lowest Senior Vice President level.

121.     Hua is from Taiwan, married with children, and holds himself out as heterosexual.

122.     Hua is approximately fourteen years younger than the Plaintiff.

123.     It is a commonly held view in Hong Kong that individuals from Taiwan are equal in status to individuals from Hong Kong.

124.     At the beginning of February 2020, Defendants hired Howard Hsu ("Hsu") as Senior Vice President ("SVP") and "Head of Corporate & Real Estate Business."

125.     Senior Vice President ("SVP") and "Head of Corporate & Real Estate Business" was the same position Wong, and before her the Plaintiff, had held, now with a different name attached.

126.     Hsu's role was the same as the Plaintiff's role when he was the Head of the Business Development Department.

127.    The salary offered to Hsu for the Senior Vice President ("SVP") and "Head of Corporate & Real Estate Business" position was $225,000.00 - $250,000.00.

128.    At the time Hsu was offered a salary of $225,000.00 - $250,000.00 for the Senior Vice President ("SVP") and "Head of Corporate & Real Estate Business" role, Defendants were paying the Plaintiff a salary of approximately $163,000.00.

129.    Hsu is originally from Taiwan, which Defendants consider to be comparable to Hong Kong in prestige.

130.    Hsu is married and has a family, and holds himself out as heterosexual.

131.    The Plaintiff is significantly more qualified than Hsu.

132.    As soon as Hsu was hired, Wong directed the Plaintiff to report to Hsu.

133.    Directing the Plaintiff to report to Hsu was a further demotion of the Plaintiff.

134.    In March 2020, the COVID-19 pandemic forced the entire New York Branch to begin working from home.

135.    While working from home, Defendants failed to provide Cheong with the secured remote system software called "LogMeIn," which prevented Cheong from viewing and retrieving files and records.

136.    The Plaintiff was one of only a few employees within the New York Branch to be deprived of the "LogMeIn" software.

137.    On May 18, 2020, Hsu emailed the Plaintiff performance goals for 2020.

138.    One goal was the minimum solicitation and successful booking of $192,500,000.00 in commercial real estate loans.

139.    This goal was provided during the beginning of the Covid-19 pandemic, which Defendants knew to be wreaking havoc on the New York commercial real estate industry.

140.    The Plaintiff asked Hsu for clarification on the performance goals.

141.    Specifically, the Plaintiff asked if the new loan requirement was entirely his responsibility, or that of the entire six-person team headed by Hsu.

142.    The Plaintiff also asked how construction loans, which are typically minimally funded in their first year, would be counted toward this goal.

143.    Hsu refused to provide answers to the Plaintiff's questions, except to say that the goals came directly from Wong.

144.    The Defendants' performance goals were devised to set the Plaintiff up to fail, and to orchestrate false cause to terminate Cheong's employment.

145.    Hsu resigned from the Defendants in August 2020. Hsu relayed to the Plaintiff that it was the former General Manager Victor Li, not Wong, who hired him. Wong disrespected him in front of other staff in the New York Branch. Hsu told the Plaintiff that Defendants' Head Office should properly train managers before sending them to overseas offices where the customs and legal environments are different.

146.    Hsu was born in Taiwan, and came to the United States at the age of six. Hsu does not speak Mandarin or Cantonese.

147.    Hsu was categorized and treated by the Defendants derogatorily as "ABC," which stands for "American Born Chinese."

148.    People from Hong Kong regard themselves as superior to ABCs.

149.    Hsu's resignation meant there was no Head of Corporate & Real Estate Business.

150.    Defendants should have, but did not have Cheong fill the Head of Corporate & Real Estate Business position.

151.    Immediately after Hsu's resignation, Wong assigned Helen Shek to attend the weekly credit committee meeting and acts as interim department head pending the external search for a new department head.

152.    The Plaintiff's stress and anxiety due to Defendants' unlawful treatment severely negatively affected his health.

153.    From July to October of 2020, the Plaintiff developed skin hives and rashes due to extreme mental distress, and had to seek medical attention three different times.

154.    In December 2020, the Defendants hired Colin Chong Tan ("Tan") as Head of Risk Management, replacing Kitty Sin.

155.    Tan is the former Head of Risk Management at Defendant's Los Angeles branch.

156.    Fang- Ning Lim ("Lim") replaced Tan at the Los Angeles branch.

157.    Lim appears to be substantially younger than the Plaintiff, appearing to be in her late thirties.

158.    Tan appears to be substantially younger than the Plaintiff, and appearing to be in his 40s.

159.    Tan is married with a family, and holds himself out as heterosexual.

160.    Sin is in her 60s.

161.    Two of Sin's senior risk management staff, both in their 60s, also "retired" in May and September 2020.

162.    Upon information and belief, these two risk management staff members were replaced with two people who were decades younger, and were from China or Taiwan.

163.    Wong's attitude toward Tan is demonstrably more positive than her behavior toward Sin.

164.    When Sin was Head of Risk Management, she told the Plaintiff that people from poor countries in Asia such as the Philippines and Indonesia have bad credit track records and cannot

be trusted.

165.   Sin is from Hong Kong, and she knew the Plaintiff is from the Philippines.

166.   Risk Management, headed by Sin, was responsible for approving all of Cheong's new deals.

167.   Wong engaged in loans to China Overseas America, Inc. ("COA") which were subsequently deemed illegal, totaling approximately $230,000,000.00 between 2018 to 2019.

168.   On August 28, 2020, the United States Department of Defense ("USDD") released a list of companies that operate directly, or indirectly, in the U.S. that have ties to the People's Liberation Army ("PLA"). PLA is the unified organization of China's land, sea, and air forces. It is one of the largest military forces in the world.

169.   China State Construction Engineering Corporation ("CSCEC") is one of the companies on the list; COA is a subsidiary of CSCEC.

170.   In November 2020, the President of the United States issued an executive order prohibiting any American individual, or company, from owning shares in any company that the USDD has listed as having links to the PLA. The purpose of the executive order was to deny American capital and funding to companies such as those with ties to the PLA.

171.   In January 2021, Wong rated the Plaintiff's performance as 1 out of 5 -- the lowest possible rating.

172.   This rating was unjustifiable.

173.   The 2020 performance evaluation process of the Plaintiff was conducted entirely by Wong.

174.   Ordinarily, the review would have been conducted by the Head of Corporate & Real Estate

Business, which is the position to whom the Plaintiff directly reported, but that position was vacant.

175.    During the performance evaluation, Wong acknowledged that the performance goal Hsu had given the Plaintiff in May 2020 requiring solicitation of a minimum of $192,500,000.00 in new commercial real estate loans was for the entire department.

176.    Notwithstanding her admission, Wong still attacked the Plaintiff for not originating $192,500,000.00 in loans. Such attack was unwarranted.

177.    The Plaintiff had successfully solicited five loans worth $230,000,000.00, which was well above the $192,500,000.00 minimum given to the entire department.

178.    Determined to establish pretext to terminate the Plaintiff, Wong refused to fully count two of the five loans.

179.    Instead of counting the full amount of $230,000,000.00, Wong counted only $155,000,000.00.

180.    Plaintiff's 2020 performance evaluation form in the Excel spreadsheet provided by the Defendants contains hidden cell formulae such that even if the $192,500,000 threshold figure or $230,000,000 is inputted, the resulting performance rating will remain at "1."

181.    Wong's failure to fully count two of the loans the Plaintiff originated is illustrative of Defendants' discriminatory animus.

182.    It is common practice to count the full commitment loan amounts toward the business development employee's performance for the year that the loan is initiated, regardless of the timing of the draws.

183.    The Defendants denied the Plaintiff a bonus for 2020, or any increase in his salary.

184.    In February 2021, Defendants hired George Benakis ("Benakis") as Senior Vice President and Head of Corporate & Real Estate Business -- the position Cheong once held with a different title name.

185.    Benakis was 49 years old when he was hired.

186.    The Plaintiff was 61 years old when Benakis was hired.

187.    Benakis is married with children, and holds himself out to be heterosexual.

188.    Benakis comes from the United States, considered by individuals from Hong Kong and Defendants as a country with high prestige compared to the Philippines.

189.    Upon information and belief, Benakis's salary package was approximately $225,000.00-$250,000.00.

190.    As of February 2021, the Plaintiff's salary was approximately $165,000.00.

191.    Benakis is substantially less qualified than Cheong to be Head of Corporate & Real Estate Business.

192.    According to his LinkedIn profile, Benakis has only about five years of commercial banking experience and no discernible managerial experience.

193.    At the time Benakis was hired, the Plaintiff had 30 years of commercial banking experience, and many years of managerial experience.

194.    Benakis has no graduate business degree.

195.    Defendants directed the Plaintiff to report to Benakis.

196.    On April 30, 2021, Wong called the Plaintiff, and then added Benakis to the call.

197.    During the call, Wong issued the Plaintiff a Performance Improvement Plan ("PIP").

198.    The PIP called for the Plaintiff to singlehandedly to originate commercial real estate loans worth at least $100,000,000.00 from May 1, 2021, to July 31, 2021.

199.    This is a preposterous requirement, and another clear indication of Defendant's discriminatory animus and determination to create pretext for the termination of the Plaintiff.

200.    Corporate & Real Estate Business's entire "Threshold" goal for all of 2020 was $192,500,000.00.

201.    This goal was set prior to the pandemic.

202.    The PIP also required the Plaintiff to write five credit proposals / annual reviews during the same three-month period.

203.    Writing credit proposals / annual reviews is the duty of the Business Managers.

204.    Thus, through the PIP, Defendants assigned the Plaintiff both business development work and the work of a Business Manager.

205.    Defendants assigned Plaintiff the business development goal of singlehandedly developing business in one quarter equal to approximately half of what the entire department of six people was tasked to develop for an entire year.

206.    The Defendants demanded that the Plaintiff sign the PIP.

207.    The wording of the PIP, if the Plaintiff signed it, was that he "agreed" with it.

208.    The Plaintiff did not agree with the PIP, and therefore did not sign it.

209.    On April 30, 2021, the Plaintiff had another call with Benakis.

210.    During this call, Benakis told the Plaintiff that the entire PIP process and its contents came from Wong.

211.    When the Plaintiff inquired with Wong what the 2021 loan origination goals were for the entire department, Wong refused to tell him.

212.    On May 3, 2021, at 12:46 p.m., Wong circulated an organizational chart via email.

213.   The organizational chart shows that Wong demoted the Plaintiff to a Senior Business Manager.

214.   The Defendants did not notify the Plaintiff of this change prior to circulating the organizational chart on May 3.

215.   The organizational chart was circulated by Wong three days after the Plaintiff protested that the PIP required him to perform duties of a Business Manager even though he did not hold that role.

216.   The organizational chart circulated on May 3 was the first time the Plaintiff was associated with the Business Manager title.

217.   The Plaintiff is the only Business Manager with a Senior Vice President title.

218.   On May 4, 2021, the morning after Wong issued the organizational chart, Wong called the Plaintiff to pressure him to sign the PIP.

219.   Upon his refusal to sign, Wong again told the Plaintiff that people were talking behind his back.

220.   When the Plaintiff asked her if people were talking behind his back regarding his job performance or something else, Wong refused to answer.

221.   The Plaintiff believed that Wong was referencing his being gay, and threatening that if he did not sign the PIP he would be outed.

222.   Being gay is very taboo in Hong Kong.

223.   The Plaintiff told Wong that it was unfair to have him responsible for $100,000,000.00 in new loans, in three months, when he was not even the Head.

224.   Wong responded by yelling at the Plaintiff.

225.    On May 6, 2021, Cheong complained to Lauren Lemole, VP - Human Resources Manager,

("Lemole") complaining of unlawful discrimination.

226.    Cheong's email to Lemole stated:

> Dear Lauren,
>
> Maggie Wong and George Benakis have issued me a performance
> improvement plan ("PIP"). I believe the PIP was issued to me for
> discriminatory reasons – because I am an older, single man from the
> Philippines.
>
> I have tried on my own to persuade Ms. Wong and Mr. Benakis that
> this PIP is not fair, but I need HR to step in and investigate my
> complaint.
>
> Please let me know the next step.
>
> Best,
> Victor

227.    Wong and Benakis continued to give the Plaintiff the contradictory role of Business

Manager while simultaneously holding him to the most stringent business development goal he

had ever had—even when he was the Head of the Business Development Department.

228.    On May 11, 2021, during the weekly department call, Benakis directed the Plaintiff to

complete the annual review for a certain loan.

229.    Completing the annual review for this loan is a Business Manager duty which had been

performed by Kenneth Wong, a Business Manager from the Plaintiff's department, for the last two

years.

230.    On May 12, 2021, the Plaintiff explained this by email to Benakis and copied Lemole

and Wong.

231.    On May 14, 2021, the Plaintiff emailed Wong, copying Lemole and Benakis, pointing out the discrepancy between his usual business development role and the new role she added to that in the PIP—the role of Business Manager. The Plaintiff's email said:

> Dear Maggie,
>
> Please look closely at the attached Goals Worksheet 2020. It is for an SVP-Business Development for which Financial Measures account for 60% weighting. For the category "Ensure high quality credit underwritings" under Non-Financial Measures, it says "Help Prepare new applications, annual reviews and status reports with acceptable quality". It did not say Prepare. And for this category, you gave me a 100% achievement. Therefore, I do not understand why the Performance Improvement Plan requires me to do five credit proposals and annual reviews.
>
> The Performance Goal of a Business Manager does not contain any Financial Measures. The Non-Financial Measures for a Business Manager mainly involve preparation of annual reviews and new credit proposals. The two positions are very different from each other.
>
> Best regards,
> Victor

232.    On May 14, 2021, Wong responded to the Plaintiff's email, copying Lemole and Benakis, stating, among other things:

> "As I mentioned over the phone with you and George, with the onboard of the new head of real estate department, George [Benakis] is mainly responsible for soliciting new business for the department. Please refer to the attached JD of business manager of the department. But you have difficulties in preparing annual reviews, please let George and me know."

233.    Wong's email continues to assert that the Plaintiff is now a Business Manager—for whom Financial Measures like loan origination do not apply -- but insisting that the Plaintiff should sign a PIP agreeing to loan origination that is exponentially higher than any previous business development goal he had when he was the Head.

234.    After the Plaintiff exposed Wong's acts to Lemole, Wong dropped the PIP.

235.    On May 21, 2021, Lemole interviewed the Plaintiff pursuant to his complaint. During the call, the Plaintiff complained that Defendants, through Wong, Benakis, and others, were discriminating against him because of his national origin and age, and because he was a single gay man.

236.    Despite Wong's retractions after the Plaintiff exposed her acts to Lemole, Lemole issued a finding on July 1, 2021 stating, among other things: "We investigated your claims and we were not able to substantiate your allegations."

237.    Benakis remains the Plaintiff's boss today.

238.    Upon information and belief, Benakis, as SVP & Head of Corporate & Real Estate Business, was not able to originate a single loan in the year 2021 since he joined the Defendants in February 2021.

239.    When Wong directed as part of her pretextual PIP against the Plaintiff on April 30, 2021 that he originate $100,000,000.00 in loans within a three month period, the Plaintiff had already booked $67,500,00.00, and another $48,333,333.33 of approved loans that closed on August 9, 2021, for a total amount of loans closed to $115,833,333.33.

240.    Since joining in February 2021, Defendants have paid Benakis approximately $60,000.00 - $85,000.00 more annually than the Plaintiff.

241.    Defendants, specifically Wong and Benakis, are now insisting that the Plaintiff is a Business Manager.

242.    This is inconsistent with Wong's admission that her directives had been contradictory, and that the Plaintiff did not have to perform Business Manager duties if he adequately performed his business development role.

243.     Wong excluded the Plaintiff from a company-wide employee survey from the Head Office in or around September 2021. Wong excluded the Plaintiff from the survey so that the Plaintiff could not make his complaint of discrimination known to the Head Office.

244.     The Plaintiff immediately complained to Lemole that his exclusion from the survey was retaliation for complaining of discrimination to HR.

245.     Benakis has impeded the Plaintiff's work by deprioritizing his originations.

246.     For example, in late 2021 / early 2022 Benakis prevented the Plaintiff's Raleigh Iron Works loan from moving forward by refusing to respond to the Plaintiff and deleting portions of Plaintiff's work on the project.

247.     Defendants refused to permit the Plaintiff utilize the $162 million line or basket for low-yielding loans; Hua was the prime beneficiary of that line, as Benakis benefitted from it as well with a $20 million loan he originated in April 2022.

248.     Benakis performed the Plaintiff's performance review for fiscal year 2021.

249.     Benakis sent the performance review to the Plaintiff at 5:40pm on January 14, 2022.

250.     January 14, 2022 was the Friday before a three-day holiday weekend.

251.     The deadline for sending performance reviews was three days earlier, January 11, 2022.

252.     Benakis gave the Plaintiff a score of 2 out of 5.

253.     The performance review score, and the timing of Benakis' delivery of the performance review score, were retaliation for complaining about discriminatory treatment.

254.     Benakis refused to have the Plaintiff enter figures in the Financial Measures section, which accounts for 60% of the review.

255.     It is the Defendants' practice to have the appraisee fill out this section on his or her evaluation.

26

256.    Benakis' calculation of the Plaintiff's new loan origination and Net Interest Margin shorted the Plaintiff.

257.    Benakis did not count $75 million in loans which should have been counted.

258.    Benakis also gave the Plaintiff a score of 0% in the category of *Ensure High Standards of Credit Underwriting*.

259.    The 0% score is flatly contradicted by Wong's email dated December 8, 2021, on which Benakis was included, stating that the Plaintiff had met his targets under the PIP.

260.    Other examples of impeding the Plaintiff's work include withholding resources from the Plaintiff, disregarding loans originated by the Plaintiff in favor of loans originated by Benakis, and ignoring communications from the Plaintiff.

261.    A significantly more lenient and questionable set of standards is applied to loans proposed by Benakis, as opposed to exceedingly rigid standards applied to the Plaintiff.

262.    The standards applied to the Plaintiff are pretext for denying his proposed loans.

263.    In a number of instances, the Defendants did not even read and evaluate the Plaintiff's "greenlight memo" and his answers to supervisors' questions.

264.    In or around early June 2022, the Plaintiff prepared and circulated a memo at the request of Benakis.

265.    The Plaintiff completed the memo successfully, and pursuant to the company's standards.

266.    Benakis nevertheless objected to the memo's format, letting it be known that he believed the Plaintiff's work on the memo to be substandard.

267.    In a call to address Benakis' response to the Plaintiff's memo with Wong and Lemole, Wong justified Benakis' behavior by explaining that he has "time management issues."

268.    During the same call, Wong questioned the Plaintiff for circulating the memo despite the fact that the maturity date required it to be sent immediately.

269.    Wong knew that the Plaintiff circulated the memo himself because Benakis refused to respond in a timely fashion.

270.    Wong subsequently called the Plaintiff to ask if there was another position in the bank where the Plaintiff could be transferred since he could not get along with Benakis.

271.    The Plaintiff responded that he did not want to be transferred.

272.    Wong asked the Plaintiff the same question, is there anywhere in the bank he could be transferred, several more times during that phone call.

273.    In June 2022, the Defendants assigned the Plaintiff objectionable performance goals substantially similar to those assigned to him 2021.

274.    Again, the 2022 goals were not fairly and equitably distributed, and were setting the Plaintiff up for failure.

275.    The Defendants' acts set forth above were discriminatory, and retaliation against the Plaintiff for complaining of unlawful discrimination.

276.    On or about September 9, 2022, Wong announced she would be "retiring" as General Manager of at the end of the year.

277.    Upon information and belief, the person replacing Wong is Francis Wong.

278.    Upon information and belief, Francis Wong is a native of Hong Kong.

279.    Upon information and belief, Francis Wong's background is in banking operations, and not business.

280.    Upon information and belief, Francis Wong is significantly younger than Wong.

281.    Just as when Wong replaced Victor Li, the General Manager position soon-to-be vacated by Wong was not posted or advertised.

282.    The Plaintiff was given no notice that the General Manager position was being vacated, and given no opportunity to apply.

## FIRST CLAIM

### Age Discrimination and Retaliation for Complaining Of Age Discrimination Under the ADEA

283.    The Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

284.    The Plaintiff is an "employee" of the Defendants as that term is defined under the ADEA, 29 U.S.C. § 630(f).

285.    The Plaintiff is "at least 40 years of age."

286.    The Defendant The Bank of East Asia, Limited, New York Branch is an employer as that term is defined by the ADEA, 29 U.S.C. § 630(b).

287.    The Defendant The Bank of East Asia, Limited is an employer as that term is defined by the ADEA, 29 U.S.C. § 630(b).

288.    By their actions described above, the Defendants engaged in unlawful employment practices in violation of ADEA, 29 U.S.C. §§ 623(a), (c), by discriminating against the Plaintiff with respect to his compensation, terms, conditions, or privileges of employment because of his age.

289.    In addition, the Defendants' conduct was in violation of ADEA, 29 U.S.C. § 623(d), by retaliating against the Plaintiff because he complained of discrimination.

290.    The unlawful practices complained of above were and are willful within the meaning of ADEA, 29 U.S.C. § 626(b).

291.    As a result of the discrimination and retaliation described above, the Plaintiff has suffered substantial loss of earnings and benefits, and he will continue to do so in the future.

292.    Accordingly, the Defendants are liable to the Plaintiff for back pay in an amount to be determined at trial, liquidated damages, mental and emotional anguish, plus interests and costs.

## SECOND CLAIM

**Race, National Origin, and Sexual Orientation Discrimination and Retaliation for Complaining of Race, National Origin, and Sexual Orientation Discrimination Under Title VII**

293.    The Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

294.    The Plaintiff is an "employee" of the Defendant The Bank of East Asia, Limited, New York Branch under Title VII, 42 U.S.C. § 2000e(f).

295.    The Plaintiff is an "employee" of the Defendant The Bank of East Asia, Limited under Title VII, 42 U.S.C. § 2000e(f).

296.    The Defendant The Bank of East Asia, Limited, New York Branch is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

297.    The Defendant The Bank of East Asia, Limited is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

298.    By their actions described above, the Defendants unlawfully discriminated against the Plaintiff on the basis of his race, national origin, and sexual orientation, and retaliated against him for complaining of such discrimination in violation of Title VII, 42 U.S.C. §§ 2000e-2(a), (c).

299.    In addition, the Defendants' conduct was in violation of Title VII, 42 U.S.C. § 2000e-3 by retaliating against the Plaintiff because he complained of discrimination.

300.    As a result of the discrimination and retaliation described above, the Plaintiff has suffered substantial loss of earnings and benefits, and he will continue to do so in the future.

301.    Accordingly, the Defendants are liable to the Plaintiff for back pay in an amount to be determined at trial, liquidated damages, mental and emotional anguish, plus interests and costs.

302.    Upon information and belief, Defendants' discriminatory conduct was conducted with malice or reckless indifference to the Plaintiff's rights. The Plaintiff is therefore entitled to punitive damages under Title VII.

### THIRD CLAIM

**Age, Race, National Origin, and Sexual Orientation Discrimination and Retaliation for Complaining of Such Discrimination Under The New York State Human Rights Law**

303.    The Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

304.    The Plaintiff was an "employee" for purposes of § 296 of the New York State Human Rights Law.

305.    The Defendant The Bank of East Asia, Limited, New York Branch is an "employer" for purposes of § 296 of the New York State Human Rights Law.

306.    The Defendant The Bank of East Asia, Limited is an "employer" for purposes of § 296 of the New York State Human Rights Law.

307.    By their actions detailed above, the Defendants unlawfully discriminated against the Plaintiff on the basis of his age, race, national origin, and sexual orientation in violation of the New York State Human Rights Law.

308.     Upon information and belief, the Defendants' conduct toward the Plaintiff constitutes willful discrimination.

309.     As a result of the willful discrimination described above, the Plaintiff suffered substantial loss of earning and benefits, and he will continue to do so in the future. Accordingly, the Defendants are liable to the Plaintiff for both back pay and front pay in an amount to be determined at trial, mental and emotional anguish, plus interest and costs.

### FOURTH CLAIM

### Age, Race, National Origin, and Sexual Orientation Discrimination and Retaliation for Complaining of Such Discrimination Under The New York City Human Rights Law, § 8-107

310.     The Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

311.     The Plaintiff is a "person" under the New York City Human Rights Law, § 8-102(1).

312.     The Defendant The Bank of East Asia, Limited, New York Branch is an "employer" under the New York City Human Rights Law, § 8-102(5).

313.     The Defendant The Bank of East Asia, Limited is an "employer" under the New York City Human Rights Law, § 8-102(5).

314.     By their actions detailed above, Defendants have unlawfully discriminated against the Plaintiff on the basis of age, race, national origin, sexual orientation, and by retaliating against the Plaintiff for complaining of such discrimination in violation of the New York City Human Rights Law, § 8-107(1).

315.     In addition, the Plaintiff opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law. Defendants retaliated against the Plaintiff for opposing Defendants' unlawful, discriminatory

employment practices and engaging in protected activity in violation of the New York City Human Rights Law, § 8-107(7).

316.    As a result of the Defendants' unlawful conduct, the Plaintiff has suffered and continues to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain, and mental anguish in amount to be determined at trial.

317.    Defendants' discriminatory conduct was done with reckless indifference to the Plaintiff's rights, entitling him to punitive damages under the New York City Human Rights Law.

318.    As a result of Defendants' unlawful conduct, they are also liable for attorneys' fees and costs.

## FIFTH CLAIM

### Interference With Protected Rights Under The New York City Human Rights Law, § 8-107(19)

319.    The Plaintiff repeats and realleges the allegations contained above as if separately set forth herein.

320.    The Defendants' actions detailed above violated § 8-107(19), which sets forth that: it shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged and other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

## SIXTH CLAIM

### Violation of The New York City Human Rights Law, § 8-107(13)(b)

321.    The Plaintiff repeats and re-alleges the allegations contained above as if separately set for herein.

322.    By the actions of the Plaintiff's supervisors detailed above, the Defendants are liable under

§ 8-107(13)(b) setting forth that:

An employer shall be liable for an unlawful discriminatory practice based upon the

conduct of an employee or agent which is in violation of subdivision one or two of

this section where:

(1) The employee or agent exercised managerial or supervisory responsibilities;

(2) The Employer knew of the employee's or agents discriminatory conduct, and acquiesced in

such conduct or failed to take immediate and appropriate corrective action; an employer shall be

deemed to have knowledge of an employee's or agent's discriminatory conduct where the conduct

was known by another employee or agent who exercised managerial or supervisory responsibility;

or

(3) The employer should have known of the employee's or agent's discriminatory conduct and

failed to exercise reasonable diligence to prevent such discriminatory conduct.

323.    The supervisors of the Plaintiff set forth above are "agents" of the Defendants, and

exercised managerial or supervisory responsibility with respect to the Defendants.

324.    The Defendants knew of the conduct of their agents, and acquiesced in such conduct and

failed to take immediate and appropriate corrective action.

325.    The Defendants should have known of the discriminatory conduct of their agents.

326.    The Defendants failed to exercise reasonable diligence to prevent the discriminatory

conduct of their agents.

327.    The Defendants are thereby liable for the discriminatory conduct of their agents.

WHEREFORE, Plaintiff prays that this Court grant judgment containing the following relief:

328.    An award of Plaintiff's actual damages in an amount to be determined at trial for loss of compensation and professional opportunities, including an award of back pay;

329.    An award of damages in an amount to be determined at trial to compensate Plaintiff for mental anguish, humiliation, embarrassment, and emotional injury;

330.    An award of punitive damages;

331.    An award of injunctive relief;

332.    An order enjoining Defendants from engaging in the wrongful practices alleged herein;

333.    An award of reasonable attorneys' fees and the costs of this action; and

334.    Such other and further relief as this Court may deem just and proper.

Dated: October 27, 2022

LITT LAW, LLC -and-
LAW OFFICE OF ANDREA PAPARELLA, PLLC

_____
By: Matthew R. Litt, Esq.
Mailing Address:
789 Farnsworth Avenue
Bordentown, New Jersey 08505
Phone: (908) 902-7071
MLitt@LittLaw.Net
*Attorney for Plaintiff Victor Cheong*